**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| | X | |
| THE NEW YORK TIMES COMPANY<br>and CHARLIE SAVAGE, | : | |
| | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Civil Action No. 17-cv-87 (CRC) |
| - against - | : | |
| | : | |
| U.S. DEPARTMENT OF JUSTICE, | : | |
| | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |
| | X | |

_____

**PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs The New York Times Company and Charlie Savage (collectively, "The Times") respectfully move the Court to enter partial summary judgment on their claims pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.   There are no genuine issues of material fact regarding The Times's entitlement under FOIA to the disclosure of the requested records to the extent Defendant seeks to withhold them pursuant to Exemption 5 to FOIA's disclosure mandate, *id.* § 552(b)(5). The accompanying Memorandum of Points and Authorities more fully sets forth the reasons that support The Times's Cross-Motion for Partial Summary Judgment.

#61782v1

Dated: New York, NY
      June 12, 2017

Respectfully submitted,


   /s/ David E. McCraw
David E. McCraw, Esq.
The New York Times Company
Legal Department
620 Eighth Avenue, 18th Floor
New York, NY 10018
phone: (212) 556-4031
fax: (212) 556-4634
mccraw@nytimes.com
*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————— X

THE NEW YORK TIMES COMPANY :
and CHARLIE SAVAGE, :
       :
       :
               Plaintiffs, :
       : Civil Action No. 17-cv-87 (CRC)
         - against - :
       :
U.S. DEPARTMENT OF JUSTICE, :
       :
       :
              Defendant. :
       :
       :
———————————————————————— X

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY**
**JUDGMENT AND IN SUPPORT OF PLAINTIFFS'**
**CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................................i

TABLE OF AUTHORITIES ........................................................................................................ii

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ........................................................................................................... 2

ARGUMENT ................................................................................................................................. 6

I.      EXEMPTION 5 DOES NOT JUSTIFY WITHHOLDING THE OLSON
MEMORANDUM OR THE COVER LETTER............................................................ 7

     A.  THE ATTORNEY-CLIENT PRIVILEGE DOES NOT JUSTIFY DOJ'S
INVOCATION OF EXEMPTION 5 ................................................................. 8

     B.  THE OLSON MEMORANDUM IS THE WORKING LAW OF DOJ.............. 17

CONCLUSION............................................................................................................................ 22

i

# TABLE OF AUTHORITIES

## CASES

*Am. Civil Liberties Union v. NSA* ("*ACLU*"), No. 13-cv-9198(KMW), 2017 WL 1155910 (S.D.N.Y. Mar. 27, 2017), ....................................................................................17 n.11, 20-21

*Am. Immigration Lawyers Ass'n v. Exec. Office of Immigration Rev.*, 830 F.3d 667 (D.C. Cir. 2016) .................................................................................................................... 6

*Bast v. Dep't of Justice*, 665 F.2d 1251 (D.C. Cir. 1981) ............................................... 6

*Brayton v. Office of the U.S. Trade Rep.*, 641 F.3d 521 (D.C. Cir. 2011). ..................... 7

*Brennan Ctr. for Justice v. Dep't of Justice*, 697 F.3d 184 (2d Cir. 2012) ............................ 18, 21

*Brinton v. Dep't of State*, 636 F.2d 600 (D.C. Cir. 1980) .......................................... 9, 14

*Chiquita Brands Int'l, Inc. v. SEC*, 805 F.3d 289 (D.C. Cir. 2015).  ...................... 7, 12

*Consumer Fed'n of Am. v. Dep't of Agric.*, 455 F.3d 283 (D.C. Cir. 2006) .................. 7

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980) ..................*Passim*

*Cuban v. SEC*, 744 F. Supp. 2d 60 (D.D.C. 2010) ............................................... 10, 17

*Elec. Frontier Found. v. Dep't of Justice* ("*EFF*"), 739 F.3d 1 (D.C. Cir. 2014) ...................... 20

*Elec. Frontier Found. v. Dep't of Justice*, No. 11-cv-5221, 2014 U.S. Dist. LEXIS 110785 (N.D. Cal. Aug. 11, 2014) ............................................................................................ 20

*Elec. Privacy Info. Ctr. v. Dep't of Justice* ("*EPIC*"), 584 F. Supp. 2d 65 (D.D.C. 2008) ...... 9, 15

*Elec. Privacy Info. Ctr. v. Dep't of Justice*, No. 06-cv-214 (RCL), 2014 U.S. Dist. LEXIS 43187 (D.D.C. Mar. 31, 2014), ................................................................... 9, 17 n.11

*Mead Data Central, Inc. v. Dep't of the Air Force*, 566 F.2d 242 (D.C. Cir. 1977) .......... 9, 10, 16

*Nat'l Ass'n of Crim. Def. Lawyers v. Exec. Office for U.S. Att'ys*, 844 F.3d 246 (D.C. Cir. 2016)7

*Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26 (D.C. Cir. 2002) ........................ 6

*NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975) ............................................... 17

*N.Y. Times v. Dep't of Justice*, 12-cv-3215(JSR), 2013 U.S. Dist. LEXIS 7396 (S.D.N.Y. Jan. 7, 2013) ............................................................................................ 21

*Schlefer v. United States*, 702 F.2d 233 (D.C. Cir. 1983) ........................9, 15, 16, 18-19

#61782v1

*Tax Analysts v. IRS* ("*Tax Analysts I*"), 117 F.3d 607 (D.C. Cir. 1997)........................ 8, 9, 15, 18

*Tax Analysts v. IRS* ("*Tax Analysts II*"), 294 F.3d 71 (D.C. Cir. 2002) ........................ 18

*Taxation without Representation Fund v. IRS*, 646 F.2d 666 (D.C. Cir. 1981) ........................... 18

*Wilderness Soc'y v. Dep't of Interior*, 344 F. Supp. 2d 1 (D.D.C. 2004).................................... 10

## STATUTES AND REGULATIONS

5 U.S.C. § 552 ...............................................................................................*Passim*

FOIA Improvement Act of 2016, Pub. L. No. 114-185, 130 Stat. 538 ........................... 8, 17 n.11

Executive Order 12333, 46 Fed. Reg. 59,941 (Dec. 4, 1981)..................................*Passim*

Executive Order 13284, 68 Fed. Reg. 4,077 (Jan. 23, 2003)................................... 5 n.3

Executive Order 13355, 69 Fed. Reg. 53,593 (Aug. 27, 2004) ............................... 5 n.3

Executive Order 13470, 73 Fed. Reg. 45,328 (July 30, 2008) .................................5 n.3, 6 nn.4-5

#61782v1

Plaintiffs The New York Times Company and Charlie Savage (collectively, "The Times") respectfully submit this memorandum of points and authorities in opposition to the motion for summary judgment by Defendant Department of Justice ("DOJ") and in support of their cross-motion for partial summary judgment on their Complaint brought under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

## PRELIMINARY STATEMENT

This case is about a single memorandum written 37 years ago that DOJ has come to treat as a precedent as authoritative as circuit law on the constitutional implications of electronic surveillance (hereinafter the "Olson Memorandum").[1]  The Olson Memorandum is an Office of Legal Counsel ("OLC") assessment of the constitutionality of certain National Security Agency ("NSA") electronic surveillance activities authorized by Executive Order ("EO") 12333. It analyzes information about contemplated intelligence activities furnished by the NSA in order to provide legal advice to the Attorney General. Evidence in the record suggests that, given its precedential character, the Olson Memorandum appears to have been circulated widely within the executive branch, well beyond the bounds of the original attorney-client relationship between OLC and the Attorney General. For these reasons: (1) the Olson Memorandum lacks qualities necessary for it to receive the protection of the attorney-client privilege, a privilege that is not nearly as broad as DOJ would have the Court believe, and (2) the Olson Memorandum bears the hallmarks of agency working law, which cannot be withheld under Exemption 5 to FOIA's

---

[1] For ease of reference, The Times will generally refer to the Olson Memorandum as shorthand for both the memorandum and the cover letter summarizing it. If the attorney-client privilege does not attach to the Olson Memorandum, then by extension it also does not attach to the cover letter.

disclosure mandate. Accordingly, DOJ is not entitled to withhold the Olson Memorandum or the Cover Letter pursuant to Exemption 5. [2]

## STATEMENT OF FACTS

### The Olson Memorandum

In 1984, Theodore Olson, then Assistant Attorney General for OLC, transmitted to the Attorney General a memorandum dated May 24 and bearing the subject line "Re: Constitutionality of Certain National Security Agency Electronic Surveillance Activities Not Covered Under the Foreign Surveillance Act of 1978." (*See* Decl. of David E. McCraw ("McCraw Decl.") ¶ 2, Ex. 1 at 4 n.4 (June 12, 2017).)  At the same time, Mr. Olson transmitted a cover letter, which contained an unclassified partial summary of the Olson Memorandum (the "Cover Letter"). (Decl. of Paul P. Colborn ("Colborn Decl.") ¶ 11 (May 5, 2017), ECF No. 13-1.) The Olson Memorandum discusses the constitutionality of contemplated NSA electronic surveillance activities carried out under the authority of Executive Order ("EO") 12333, 46 Fed. Reg. 59,941 (Dec. 4, 1981).[3] (*See* McCraw Decl., Ex. 1 at 4 n.4, Ex. 2 at 22; Colborn Decl. ¶ 12, Ex. D (second row from the top on page 1 of the *Vaughn* index).)  EO 12333 furnishes the NSA and other agencies legal authority to collect information—including about United States

---

[2] On May 3, 2017, the Court granted the parties' consent motion to bifurcate summary judgment briefing. *See* Minute Order, *N.Y. Times v. Dep't of Justice*, No. 17-cv-87(CRC) (D.D.C. May 3, 2017). Accordingly, The Times here addresses only DOJ's Exemption 5 arguments. The Times reserves the right to challenge DOJ's withholdings pursuant to Exemptions 1 and 3 should its arguments against DOJ's invocation of Exemption 5 prevail. The Times also reserves the right, at that stage, to challenge DOJ's claim with respect to segregability. (*See* Colborn Decl. ¶ 20.)

[3] EO 12333 has since been amended on several occasions. *See* EO 13284, 68 Fed. Reg. 4,077 (Jan. 23, 2003); EO 13355, 69 Fed. Reg. 53,593 (Aug. 27, 2004); EO 13470, 73 Fed. Reg. 45,328 (July 30, 2008). The Times will refer to the pre-amendment version of EO 12333, because it was in effect at the time OLC transmitted the Olson Memorandum to the Attorney General.

persons[4]—through electronic surveillance, as well as to retain and disseminate that information. *See* EO 12333 §§ 1.12(b), 2.2-2.4, 46 Fed. Reg. at 59,947-51.  It "is the principal Executive Branch authority for foreign intelligence activities not governed by [the Foreign Intelligence Surveillance Act]," including the collection of signals intelligence by the NSA. THE PRESIDENT'S REV. GP. ON INTEL. & COMMS. TECH., LIBERTY AND SECURITY IN A CHANGING WORLD, at 69-70 (Dec. 12, 2013), *available at* http://bit.ly/2jkiXew; *see also* PRIVACY & CIV. LIBERTIES OVERSIGHT BD., SEMI-ANNUAL REPORT: APRIL 2014 – SEPTEMBER 2014, at 9 (Dec. 22, 2014), *available at* http://bit.ly/2sLK48m. The Attorney General is heavily involved in approving the surveillance practices authorized by EO 12333. For example, at the time the Olson Memorandum was written, § 2.3 and § 2.4 of EO 12333, 46 Fed. Reg. at 59,950-51, assigned to the Attorney General's sole discretion approval of the procedures for collection, retention, and dissemination of information concerning United States persons by the NSA and other agencies of the Intelligence Community.[5]

 The information underlying the legal advice provided by the Olson Memorandum came from an executive branch agency DOJ declines to name, which is almost certainly the NSA, *see* n.6 *infra*, and concerned that agency's contemplated intelligence activities. (*See* Colborn Decl. ¶ 12.) That information appears to have detailed proposed electronic surveillance techniques and procedures that the NSA hoped to employ under the authority of EO 12333. (*See* McCraw Decl., Ex. 1 at 4 n.4, Ex. 2 at 22; Colborn Decl., Ex. D (*Vaughn* index, second row).)  The Olson

---

[4] "United States person" means a United States citizen, a legal permanent resident, and business entities with certain connections to the United States. EO 12333, § 3.4(i), 46 Fed. Reg. at 59,954. A 2008 amendment to EO 12333 subsequently redesignated this definition as § 3.5(k). EO 13470 § 4(h), 73 Fed. Reg. at 45,341.
[5] Sections 2.3 and 2.4 of EO 12333 were amended in 2008 to require that the Attorney General consult with the Director of National Intelligence in deciding whether to approve new surveillance procedures. EO 13470, §§ 3(e), 3(r), 73 Fed. Reg. at 45,338. Those amendments, however, were not in effect at the time the Olson Memorandum was drafted.

Memorandum, however, was not addressed to the NSA, and DOJ does not say that it was written to provide legal advice to the NSA. (*See* Colborn Decl. ¶ 16.) Rather, it was written to provide legal advice to the Attorney General, who "eventual[ly] transmi[tted]" it to the NSA. (*Id.*)  DOJ does not say when or why the Attorney General eventually transmitted the Olson Memorandum to the NSA.  Specifically, it does not say that the Attorney General did so in order to provide the NSA legal advice.

### DOJ's Reliance on the Olson Memorandum as Precedent

The NSA's use of its EO 12333 surveillance authority has continued to raise serious Fourth Amendment concerns in the decades since OLC issued the Olson Memorandum. Even some former government officials have expressed discomfort with the scope and oversight of EO 12333 surveillance. *See, e.g.*, John Napier Tye, Op-Ed., *Meet Executive Order 12333: The Reagan Rule That Lets the NSA Spy on Americans*, WASH. POST, July 18, 2014, *available at* http://wapo.st/2t3hZZv (op-ed by former Obama Administration State Department section chief). Congressional oversight committees have also raised questions about the NSA's surveillance activities under EO 12333, and when pressed by the Senate Judiciary Committee on the legality of these activities, executive branch officials have relied on the Olson Memorandum. (*See* McCraw Decl., Ex. 2 at 22.) Sen. Dianne Feinstein—a senator well versed in these issues, as a long-sitting member of both the Judiciary Committee and the Senate Select Committee on Intelligence—has said that these executive branch officials have characterized the Olson Memorandum as a "seminal" OLC opinion that "*govern[s]* the conduct of collection activities under Executive Order 12333." (*Id.* (emphasis added).)

Indeed, there is direct evidence of DOJ's reliance on the Olson Memorandum as internal precedent with respect to the Fourth Amendment implications of electronic surveillance under

4

EO 12333. That evidence can be found in a November 20, 2007, memorandum submitted to the Attorney General by Kenneth L. Wainstein, then-Assistant Attorney General for DOJ's National Security Division ("NSD") (the "Wainstein Memorandum"). (*See* McCraw Decl., Ex. 1.) The Wainstein Memorandum assessed whether certain techniques the NSA planned to use to analyze metadata—*i.e.*, "dialing, routing, addressing, or signaling information that does not concern the substance, purport, or meaning of communications"—collected through electronic surveillance violated the Fourth Amendment, various federal statutes, or the terms of EO 12333. (*See id.* at 1-4.) In analyzing the Fourth Amendment implications of these techniques, the Wainstein Memorandum concluded that a person has no reasonable expectation of privacy in the metadata NSA planned to analyze. (*Id.* at 4-5.)  The Wainstein Memorandum expands on that conclusion by asserting that "the analysis of information legally within the possession of the Government is likely neither a 'search' nor a 'seizure' within the meaning of the Fourth Amendment." (*Id.* at 4 n.4.) For that proposition, it cites two sources, using a "*see, e.g.*" signal to indicate that these two sources are examples of precedent that supports the proposition. (*Id.*) The first citation is to a Sixth Circuit opinion from 1982, which holds that one agency sharing lawfully obtained information with another agency does not raise Fourth Amendment concerns. (*Id.* (citing *Jabara v. Webster*, 691 F.2d 272, 277-79 (6th Cir. 1982).) Immediately thereafter, the Wainstein Memorandum cites to the Olson Memorandum to support the same proposition. (*Id.*) The Wainstein Memorandum goes on to show that the precedential effect of the Olson Memorandum within DOJ is methodological as well as substantive. The author of the Wainstein Memorandum felt compelled to build part of his analysis around what he considered an unnecessary assumption—"that the Fourth Amendment may apply" to the subsequent analysis of information

5

"the Government has already obtained . . . lawfully"—because the Olson Memorandum had done so. (*Id.*).

**The FOIA Request**

On October 28, 2016, The Times filed a FOIA request with the NSD and OLC, seeking the Olson Memorandum. (*See* Colborn Decl., Ex. A.)  Subsequently, on December 13, 2016, The Times sent an email to OLC. (*See id.*, Ex. B.) In that email, The Times indicated that it believed that its October 28 request encompassed the Cover Letter. (*Id.*) OLC did not respond within the time limits set by FOIA, which meant that The Times had exhausted its administrative remedies. *See* 5 U.S.C. § 552(a)(6)(A)(i), (a)(6)(C). The Times filed this lawsuit on January 13, 2017. (*See* Dkt. No. 1.)  On March 10, 2017, OLC responded to The Times's FOIA request, asserting that it was withholding the Olson Memorandum and the Cover Letter in full pursuant to Exemption 5, 5 U.S.C. § 552(b)(5), and that parts of the Olson Memorandum were exempt from disclosure pursuant to Exemptions 1 and 3, *id.* § 552(b)(1), (b)(3). (Colborn Decl., Ex. C.)

## ARGUMENT

FOIA contains a disclosure mandate limited only by nine exemptions. 5 U.S.C. § 552(a)(3)(A), (b)(1)-(9). "FOIA reflects 'a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language.'"  *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 360-61 (1976)). In light of this purpose, FOIA's exemptions must be construed narrowly, *Am. Immigration Lawyers Ass'n v. Exec. Office of Immigration Rev.*, 830 F.3d 667, 673 (D.C. Cir. 2016), and doubts are to be construed in favor of disclosure, *Bast v. Dep't of Justice*, 665 F.2d 1251, 1253 (D.C. Cir. 1981).  "FOIA establishes a strong presumption in favor of disclosure" and places on the agency the burden of demonstrating that an exemption justifies

6

withholding requested documents. *Chiquita Brands Int'l, Inc. v. SEC*, 805 F.3d 289, 294 (D.C. Cir. 2015).  FOIA litigation is typically resolved on summary judgment. *See Brayton v. Office of the U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011).

A Court reviews *de novo* an agency's decision to withhold information from the public. 5 U.S.C. § 552(a)(4)(B).  Although a court may grant summary judgment "on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements," the court must also consider "contradictory evidence in the record" that may call into question the agency's assertions. *Consumer Fed'n of Am. v. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006).  FOIA's segregability requirement mandates that, even if part of a document is exempt from disclosure, an agency must still release any non-exempt portions that can be separated out through redaction. *See* 5 U.S.C. § 552(b); *see also Nat'l Ass'n of Crim. Def. Lawyers v. Exec. Office for U.S. Att'ys*, 844 F.3d 246, 256 (D.C. Cir. 2016).

## I.

## EXEMPTION 5 DOES NOT JUSTIFY WITHHOLDING THE OLSON MEMORANDUM OR THE COVER LETTER

At the outset, let's be clear about what this case is about. It is about a unique set of facts that render Exemption 5 inapplicable to a single OLC memorandum. The Times is not arguing that OLC opinions and memoranda can never receive the protections of Exemption 5. Nor is it arguing anything at all categorical about Exemption 5 and OLC opinions and memoranda. What The Times is arguing is that the publicly available information specific to the Olson Memorandum demonstrates that Exemption 5 cannot apply to it. That is for three reasons. *First*, the deliberative-process privilege cannot apply to the Olson Memorandum because of its age. As DOJ concedes (Colborn Decl. ¶ 14), Congress has decided that the privilege cannot apply to

7

documents that are more than 25 years old. *See* FOIA Improvement Act of 2016, Pub. L. No. 114-185, § 2(2), 130 Stat. 538, 540 (amending 5 U.S.C. § 552(b)(5)). *Second*, DOJ has not met its burden to demonstrate that the attorney-client privilege applies to the Olson Memorandum. *Third*, the publicly available evidence demonstrates that, even if the attorney-client privilege did at one time apply, the Olson Memorandum has become the working law of DOJ, which places it outside the ambit of Exemption 5.

## A.

### THE ATTORNEY-CLIENT PRIVILEGE DOES NOT JUSTIFY DOJ'S INVOCATION OF EXEMPTION 5

DOJ has failed to meet its burden of demonstrating that the Olson Memorandum—and by derivation, the Cover Letter that summarizes it—are shielded from disclosure by the attorney-client privilege, pursuant to Exemption 5. Exemption 5 permits an agency to decline to disclose "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The attorney-client privilege is among the privileges that may support an invocation of Exemption 5. *See Tax Analysts v. IRS* ("*Tax Analysts I*"), 117 F.3d 607, 616 (D.C. Cir. 1997). But the privilege does not automatically attach to every attorney-client communication and, in fact, is subject to significant limitations. Indeed, "[l]ike all privileges . . . the attorney-client privilege is narrowly construed and is limited to those situations in which its purposes will be served," namely, to protect a *client's* ability—not the ability of non-client third parties—to provide his or her attorney the facts necessary to obtain legal advice. *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980).

#61782v1

In the case of communications from attorney to client, the privilege operates only when two conditions are met: (1) "the communication from attorney to client is confidential" and (2) "the communication is based on confidential information provided *by the client*." *Schlefer v. United States*, 702 F.2d 233, 245 (D.C. Cir. 1983) (emphasis added); *see also Elec. Privacy Info. Ctr. v. Dep't of Justice* ("*EPIC*"), 584 F. Supp. 2d 65, 79 (D.D.C. 2008), *summary judgment granted on other grounds*, 2014 U.S. Dist. LEXIS 43187 (D.D.C. Mar. 31, 2014).  The privilege, however, does not apply when the information on which the attorney bases the client communication was supplied by a party other than the client. *See Brinton v. Dep't of State*, 636 F.2d 600, 604 (D.C. Cir. 1980). So, for example, the privilege does not apply when a government client asks a government attorney to provide "neutral, objective analyses" of how the law applies to facts provided by a third party. *Coastal States*, 617 F.2d at 863. In the government agency context, not every official within the agency seeking advice is a "client" for privilege purposes. *See Mead Data Central, Inc. v. Dep't of the Air Force*, 566 F.2d 242, 253 n.24 (D.C. Cir. 1977); *see also Coastal States*, 617 F.2d at 863; *EPIC*, 584 F. Supp. 2d at 79-80. Only those officials within the client agency "who are authorized to speak or act for the organization in relation to the subject matter of the communication" fall within the scope of the attorney-client relationship. *Mead Data*, 566 F.2d at 253 n.24; *see also Coastal States*, 617 F.2d at 863. When the attorney communicates to the client, the privilege applies only if the communication "is based on confidential information provided by the client." *Schlefer*, 702 F.2d at 245; *see also Tax Analysts I*, 117 F.3d at 619; *Coastal States*, 617 F.2d at 863; *EPIC*, 584 F. Supp. 2d at 79-80.

As for confidential nature of the communication, the government must show that the attorney and client have maintained the confidentiality of the allegedly privileged document since the time of the attorney-client communication. *See Coastal States*, 617 F.2d at 863; *Mead*

9

*Data*, 566 F.2d at 253-54; *Wilderness Soc'y v. Dep't of Interior*, 344 F. Supp. 2d 1, 18 (D.D.C. 2004). In order to do so, the government must demonstrate that the information was not circulated beyond the officials who fall within the attorney-client relationship. *See Mead Data*, 566 F.2d at 253 n.24; *Coastal States*, 617 F.2d at 863. "If facts have been made known to persons other than those who need to know them, there is nothing on which to base a conclusion that they are confidential." *Coastal States*, 617 F.2d at 863. "The attorney-client privilege is not applicable just because the defendant states that it applies," and summary judgment is inappropriate where "the defendant's declaration reveals that the defendant offers nothing more than conclusory assertions and blanket affirmations." *Cuban v. SEC*, 744 F. Supp. 2d 60, 79 (D.D.C. 2010).

Here is the sum total of what DOJ's declarant has said to support the application of the attorney-client privilege to the Olson Memorandum. He has said that the Olson Memorandum "was written in response to confidential communications from an executive branch client soliciting legal advice from OLC attorneys regarding contemplated intelligence activities," and that it contains "confidential client communications made for the purpose of seeking legal advice . . . from OLC attorneys transmitted to an executive branch client." (Colborn Decl. ¶ 12.) He has also said that the Olson Memorandum and the Cover Letter "(a) contain confidential legal advice provided to the Attorney General for eventual transmission to another executive branch client; and (b) reflect confidential client information transmitted through confidential communications between OLC and an executive branch client for the purpose of seeking and providing that legal advice." (*Id.* ¶ 16.)

That is nothing more than a verbal sleight of hand. DOJ has not met its burden to show that the attorney-client privilege shields the requested records. Here is what the two statements

10

made by DOJ's declarant in fact say. *First*, the NSA, in 1984, furnished information to OLC about contemplated electronic surveillance activities pursuant to its EO 12333 authorities.[6] *Second*, OLC drafted the Olson Memorandum in order to provide legal advice to the Attorney General, not to the NSA. (Colborn Decl. ¶ 16.) Indeed, the memorandum was addressed and transmitted to the Attorney General alone, not to the general counsel of the NSA or any other NSA official. (*Id.* ¶ 16, Ex. D (*Vaughn* index, second row); McCraw Decl., Ex. 1 at 4 n.4.) *Third*, OLC relied on the information furnished by the NSA about its proposed surveillance activities to "provid[e] *that* legal advice," *i.e.*, legal advice to the Attorney General.[7] (Colborn Decl. ¶ 16 (emphasis added).) Specifically, the Olson Memorandum provided to the Attorney General a constitutional analysis of—and in particular, an analysis of the Fourth Amendment implications of—proposed NSA surveillance activities under the authority of EO 12333. (McCraw Decl., Ex. 1 at 4 n.4; Colborn Decl. ¶¶ 12, 16.)

Put simply, OLC attorneys provided advice to their client, the Attorney General, using information provided by a third party, the NSA.  While DOJ could have asserted it or the Attorney General then provided that legal advice to the NSA, it tellingly fails to make that claim. Instead, it opted for the ambiguous formulation "eventual transmission" to the NSA. (Colborn

---

[6] Although DOJ's declarant does not say this outright, the following facts support the conclusion that NSA provided OLC this information. DOJ's declarant states that OLC received confidential information about "contemplated intelligence activities" from "an executive branch client." (Colborn Decl. ¶ 12.) DOJ's declarant does not say whether that is the Attorney General or another official or entity, but given his later express reference to the Attorney General (*id.* ¶ 16), the best reading of this statement is that "executive branch client" refers to a government entity other than the Attorney General. The title of the Olson Memorandum—and DOJ's acknowledgment of a legal memorandum responsive to The Times's FOIA request based on that title (*id.* ¶ 12, Exs. A, C-D)—strongly suggest that DOJ's declarant here is referring to the NSA. (*See* McCraw Decl., Ex. 1 at 4 n.4.) DOJ's *Vaughn* index, at row 2, indicates that the memorandum pertains to electronic surveillance activities authorized by EO 12333. (*See* Colborn Decl., Ex. D; *see also id.* ¶ 13 (stating that "OLC 2" in *Vaughn* index is the Olson Memorandum at issue in this case).) So too do Sen. Dianne Feinstein's comments during a 2015 Senate Judiciary Committee hearing. (*See* McCraw Decl., Ex. 2 at 22.) Given the foregoing, for ease of reference, The Times will refer to what DOJ calls OLC's "executive branch client" as the NSA.

[7] The clear referent of the demonstrative adjective "that" is "legal advice provided to the Attorney General." (*See* Colborn Decl. ¶ 16.)

Decl. ¶ 16.) The Attorney General may have later transmitted the Olson Memorandum to the NSA for any number of reasons unrelated to providing legal advice that would assist the NSA in its policymaking or decisionmaking. Transmission alone, after all, does not imply advice. The Attorney General has his own independent obligations under EO 12333. Specifically, prior to amendments made to EO 12333 in 2008, he—and he alone—was tasked with deciding whether to approve proposed NSA electronic surveillance techniques and procedures. *See* EO 12333, §§ 2.3-2.4, 46 Fed. Reg. at 59,950-51. He may have eventually transmitted the Olson Memorandum to the NSA by way of explaining his ultimate decision to approve (or not) NSA's proposed surveillance procedures. Or he may have transmitted it to the NSA for some altogether different reason. The point is we do not know why he eventually transmitted the Olson Memorandum to the NSA because DOJ does not say. It is not for the plaintiffs and the Court in a FOIA case to speculate about how Exemption 5 may or may not apply; it is for the defendant to make its case. *See Chiquita Brands*, 805 F.3d at 294.

This is not DOJ's only relevant omission. Another is that its declarant fails to say whether—and to what extent—the Olson Memorandum has been shared or circulated within and outside DOJ.

Accordingly, DOJ has failed in three respects to meet its burden to show the applicability of the attorney-client privilege under Exemption 5. *First*, it has not shown that the NSA was OLC's client for purposes of the Olson Memorandum. Instead, it has shown only that an attorney-client relationship existed between OLC and the Attorney General. *Second*, DOJ has conceded that OLC's client for purposes of the Olson Memorandum—the Attorney General— did not provide the factual information on which the memorandum was based. That information came from a third party, the NSA. *Third*, DOJ has not shown that the confidentiality of the Olson

12

Memorandum has been maintained in the decades since its creation. To the contrary, the publicly available evidence suggests that it has been shared well beyond the bounds of the attorney-client relationship.

**1. The Attorney-Client Relationship.** Although DOJ has demonstrated that, for purposes of the Olson Memorandum, an attorney-client relationship existed between OLC and the Attorney General, it has not demonstrated that one existed between OLC and the NSA. The most DOJ's declarant can say is that OLC provided the legal advice contained in the Olson Memorandum to the Attorney General and that the Attorney General "eventual[ly] transmi[tted]" it to NSA for some unspecified purpose. (Colborn Decl. ¶ 16.) DOJ does not say whether the Attorney General transmitted the Olson Memorandum in order to provide legal advice to guide a decisionmaking process within the NSA. Nor has it provided a declaration from an NSA official attesting to the existence of an attorney-client privilege between the NSA and either the Attorney General or OLC with respect to the legal advice contained in the Olson Memorandum.[8]

Moreover, the fact that OLC addressed the Olson Memorandum to the Attorney General—viewed in light of OLC's practice at the time—underscores that the attorney-client relationship here was between OLC and the Attorney General and not between OLC and the NSA. In 1984, when the Olson Memorandum was written, OLC's practice was to respond directly to a non-DOJ agency client that had requested legal advice. *See, e.g.*, Mem. Op. for the Deputy Legal Adviser, Dep't of State, from Larry L. Simms, Deputy Ass't Att'y Gen., OLC, *Authority of the State Department Office of Security to Investigate Passport and Visa Fraud* (Aug. 17, 1984), *available at* http://bit.ly/2s5e0OO; Mem. Op. for the Acting Gen. Counsel,

---

[8] To the extent DOJ cannot identify the NSA by name, it could have redacted the identity of the agency from the declaration.

Dep't of Def., from Theodore B. Olson, Ass't Att'y Gen., OLC, *Effect of* INS v. Chadha *on the Authority of the Secretary of Defense to Reorganize the Department of Defense Under U.S.C. § 125* (Apr. 26, 1984), *available at* http://bit.ly/2t3rcB0.  It was also common at the time for OLC's DOJ clients to seek legal advice pertaining to the activities of non-DOJ agencies, which were not OLC's client for purposes of those memoranda. *See, e.g.*, Mem. Op. for the Acting Ass't Att'y Gen., Civil Div., from Theodore B. Olson, Ass't Att'y Gen., OLC, *Authority of the Equal Opportunity Commission to Conduct Defensive Litigation* (June 21, 1984), *available at* http://bit.ly/2r3wgEB; Mem. Op. for the Ass't Att'y Gen., Land & Natural Res. Div., from Theodore B. Olson, Ass't Att'y Gen., OLC, *Application of the Resource Conservation and Recovery Act to the Department of Energy's Atomic Energy Act Facilities* (Feb. 9, 1984), *available at* http://bit.ly/2r3umEb.

In other words, the subject of OLC's analysis—here the NSA's contemplated surveillance activities—does not define which executive branch agency or official stood in an attorney-client relationship vis-a-vis OLC. It would not be surprising for the Attorney General, as OLC's client, to request legal advice about the NSA's proposed surveillance activities, particularly given his responsibilities under § 2.3 and § 2.4 of EO 12333, 46 Fed. Reg. at 59,950-51, to approve or deny proposed NSA electronic surveillance techniques and procedures.

**2. Third-Party Information.** The fact that the Attorney General was OLC's sole client for purposes of the legal advice provided in the Olson Memorandum is fatal to DOJ's attempt to invoke Exemption 5 for another reason.  Legal advice based on information provided by a non-client is not privileged. *See Brinton*, 636 F.2d at 604. DOJ concedes that the NSA, not the Attorney General, provided OLC information about its contemplated intelligence activities, which formed the basis of the Olson Memorandum's analysis. (Colborn Decl. ¶¶ 12, 16.) The

14

D.C. Circuit has repeatedly held that the attorney-client privilege does not attach to legal advice provided by agency attorneys to agency clients when the advice involves "neutral, objective analyses" of how the law applies to a set of facts provided by outside entities, such as companies or taxpayers under audit. *Coastal States*, 617 F.2d at 862-63; *see also Tax Analysts I*, 117 F.3d at 618-19; *Schlefer*, 702 F.2d at 245.  More to the point, another court in this District has held that the attorney-client privilege does not attach to attorney-client communications based on information "provided by an agency other than the agency or executive branch entity/official that is asserting the attorney-client privilege." *EPIC*, 584 F. Supp. 2d at 80. As that court noted, although other privileges or exemptions may shield such information from disclosure, the attorney-client privilege does not. *See id.*

Consider the following scenario, which illustrates the failure of the DOJ to meet its burden. Suppose the Olson Memorandum served roughly the same function the Wainstein Memorandum did 23 years later: it advised the Attorney General as to the constitutionality of proposed NSA surveillance procedures in order to help him decide whether he ought to approve those procedures, pursuant to responsibilities vested in him and him alone under § 2.3 and § 2.4 of EO 12333, 46 Fed. Reg. at 59,950-51. (*See* McCraw Decl., Ex. 1 at 1-3, 8-10.)[9]  In order to provide the Attorney General the requested legal advice, OLC receives from the NSA its proposed surveillance procedures, to which OLC applies its constitutional analysis. In this scenario, the Olson Memorandum would not be covered by the attorney-client privilege, because OLC is providing legal advice to its client based on information provided by a non-client. *See EPIC*, 584 F. Supp. 2d at 80; *see also Tax Analysts I*, 117 F.3d at 618-19; *Coastal States*, 617

---

[9] As discussed in note 5, *supra*, a 2008 amendment to EO 12333 requires the Attorney General to consult with the Director of National Intelligence before deciding whether to approve surveillance procedures. But in 1984, when OLC produced the Olson Memorandum, the decision was assigned solely to the Attorney General.

15

F.2d at 862-63; *Schlefer*, 702 F.2d at 245.  This scenario is entirely consistent with the facts averred to by DOJ's declarant,[10] and that alone reveals the inadequacy of DOJ's declaration.

**3. Confidentiality.** Finally, DOJ's declarant says nothing about how widely the Olson Memorandum has been shared or circulated within or outside DOJ. Nor does he say what steps have been taken to protect the confidentiality of the memorandum. In light of these omissions, the D.C. Circuit's decision in *Coastal States*, 617 F.2d at 863-64, squarely forecloses summary judgment in favor of DOJ.

But the problem for DOJ here is not merely its declarant's silence. There is evidence in the record that suggests the Olson Memorandum has been circulated widely within the executive branch, and DOJ has not explained how those officials who have had access to the memorandum fall within the bounds of the attorney-client relationship between OLC and the Attorney General. *See Mead Data*, 566 F.2d at 253 n.24 (only officials within client agency "who are authorized to speak or act for the organization in relation to the subject matter of the communication" fall within the scope of attorney-client relationship); *Coastal States*, 617 F.2d at 863 (same). For one thing, the record shows that, beyond the Attorney General, attorneys at DOJ's NSD and one or more officials at the NSA have or have had access to the Olson Memorandum. (McCraw Decl., Ex. 1 at 4 n.4; Colborn Decl. ¶ 16.) For another, a number of other executive branch officials have cited to it in congressional testimony as a "seminal OLC opinion" that "govern[s] the conduct of collection activities under Executive Order 12333," indicating that they, too, have had access to the Olson Memorandum. (McCraw Decl., Ex. 2 at 22.) "To the extent that any

---

[10] Notably, DOJ has admitted that the Olson Memorandum concerned "*contemplated* intelligence activities," suggesting that they were at a stage where they would have required the Attorney General's signoff under § 2.3 or § 2.4 of EO 12333, 46 Fed. Reg. at 59,950-51. (Colborn Decl. ¶ 12 (emphasis added); *see also* Statement of Material Facts as to Which Def. Contends There Is No Genuine Issue ¶ 5 (May 5, 2017), ECF No. 13-2.)

information, including factual information contained within the records, was relayed to anyone outside the sphere of those who needed to know the information within the organization, that information cannot be withheld, and the records must be produced completely or in a redacted form if another exemption justifies the withholding." *Cuban*, 744 F. Supp. 2d at 80.[11]

For the foregoing reason, DOJ has not satisfied its burden of showing that the attorney-client privilege applies to the Olson Memorandum under Exemption 5.

## B.

## THE OLSON MEMORANDUM IS THE WORKING LAW OF DOJ

Even if the Olson Memorandum were once shielded by the attorney-client privilege, FOIA would still require its release as "working law."  When a document has come to "embody [any agency's] effective law and policy," it is "working law"— in this case, DOJ's working law with respect to the Fourth Amendment limitations on electronic surveillance under EO 12333.

*See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 (1975). A document that constitutes

---

[11] DOJ cites two cases to support the application of the attorney-client privilege to the Olson Memorandum. Neither undercuts The Times's arguments. *Electronic Privacy Information Center v. Department of Justice*, No. 06-cv-214 (RCL), 2014 U.S. Dist. LEXIS 43187, at *4-5 (D.D.C. Mar. 31, 2014), held that the OLC documents at issue in that case were protected by the attorney-client and deliberative-process privileges—relying principally on the latter and providing no analysis with respect to the former. The Times does not dispute that some OLC records may be shielded from disclosure by the attorney-client privilege. But that case did not involve the Olson Memorandum or facts at all similar to those present in this case. As to *American Civil Liberties Union v. NSA* ("*ACLU*"), No. 13-cv-9198(KMW), 2017 WL 1155910 (S.D.N.Y. Mar. 27, 2017), the page DOJ cites to does not stand for the proposition DOJ claims it does. (*See* Mem. of Points & Auth. in Supp. of Def.'s Mot. for Summary Judgment at 9, ECF No. 13.) That page simply sets out the legal standard for the attorney-client privilege; it does not apply it to the Olson Memorandum. *See ACLU*, 2017 WL 1155910, at *9. In fact, the only analysis specific to the Olson Memorandum in that decision discusses why the court did not think the working-law exception to Exemption 5 applied. *Id.* at *10-11. The court provided no affirmative analysis of why the attorney-client privilege may or may not have applied to the Olson Memorandum. That was at least in part because plaintiffs in that case had not argued in their opening brief that DOJ had failed to satisfy the elements of the attorney-client privilege. *Id.* at *10. (Rather, plaintiffs' argument focused on why working law overcame the attorney-client privilege.) Moreover, the court's only affirmative ruling on the attorney-client privilege was that "OLC has sufficiently justified its exemptions under the deliberative process and attorney-client privileges." *Id.* That ruling referred to a number of OLC documents at issue in that case. It is not clear from the court's ruling which privilege the court held to cover the Olson Memorandum. The deliberative-process privilege remained available in that case because the FOIA request was filed before the effective date of the FOIA Improvement Act of 2016, Pub. L. No. 114-185, § 2(2), 130 Stat. 538, 540, which removes the protections of the deliberative-process privilege from documents that are more than 25 years old.

working law loses the protection of Exemption 5. *See Tax Analysts I*, 117 F.3d at 619-20. The

purpose of the working law exception is to prevent an agency from developing "a body of 'secret

law,' used by it in the discharge of its regulatory duties . . . but hidden behind a veil of privilege

because it is not designated as 'formal,' 'binding,' or 'final.'" *Coastal States*, 617 F.2d at 867.

The working law analysis is a functional one—examining the full range of relevant evidence

available—and "cannot be determined mechanically from the decisionmaking process formally

prescribed by" an agency. *See Schlefer*, 702 F.2d at 244; *see also Tax Analysts v. IRS* ("*Tax

Analysts II*"), 294 F.3d 71, 82 (D.C. Cir. 2002) (working law analysis "not amenable to a

categorical formula" and reliant on a wide array of relevant evidence). One important factor

running through many working law opinions in this Circuit is the "precedential weight the

agency accords to the documents": whether later documents of the same type cite to and are

guided by earlier documents and whether the agency preserves and indexes the documents for

future reference. *Schlefer*, 702 F.2d at 241-44 & n.19; *see also Taxation without Representation

Fund v. IRS*, 646 F.2d 666, 679 & n.20 (D.C. Cir. 1981); *Coastal States*, 617 F.2d at 869; *cf.

Brennan Ctr. for Justice v. Dep't of Justice*, 697 F.3d 184, 199-202 (2d Cir. 2012)*.

  Here, several pieces of evidence in the record indicate that the Olson Memorandum has

become the precedential working law of DOJ with respect to the constitutionality of electronic

surveillance procedures under the authority of EO 12333. *First*, the Wainstein Memorandum,

which analyzed the legality of proposed NSA metadata analysis procedures under EO 12333,

places the Olson Memorandum on par with circuit law as authority for the proposition that

analysis of information legally obtained by the government does not implicate the Fourth

Amendment. (McCraw Decl., Ex. 1 at 4 n.4.) *Second*, the precedential effect of the Olson

Memorandum within DOJ is more than substantive; it is also methodological: the author of the

Wainstein Memorandum adopted the analytic framework that guided the memorandum's Fourth Amendment inquiry directly from the Olson Memorandum. (*Id.* (despite assessing that examination of information lawfully obtained by the NSA would not implicate the Fourth Amendment, conducting constitutional analysis on the assumption that the Fourth Amendment might apply to this later examination simply because "the Olson Memorandum went on to consider" it).)  He felt constrained by the methodology of analysis established by the Olson Memorandum, much the way a district court might follow the analytic framework established by a court of appeals. *Third*, the Wainstein Memorandum was written by an assistant attorney general for NSD in a memorandum for the Attorney General's consideration, which suggests that the Olson Memorandum has taken on precedential effect not only within OLC, but throughout the components of DOJ responsible for assessing the constitutionality of electronic surveillance procedures under the authority of EO 12333.[12] *Fourth*, the Olson Memorandum was indexed and available to other DOJ officials, as both OLC policy, *see* David J. Barron, Acting Ass't Att'y Gen., OLC, *Best Practices for OLC Legal Advice and Written Opinions*, at 4-5 (July 16, 2010), *available at* http://bit.ly/1r7LHf3, and the Wainstein Memorandum demonstrate. *See Schlefer*, 702 F.2d at 241-44 & n.19; *Coastal States*, 617 F.2d at 869. *Fifth*, executive branch officials have repeatedly cited to the Olson Memorandum to justify to congressional oversight committees the legality of certain electronic surveillance activities authorized by EO 12333. (McCraw Decl., Ex. 2 at 22.) Indeed, according to Sen. Feinstein, executive branch officials have told the Senate

---

[12] The Olson Memorandum would, as a matter of policy, have precedential effect within OLC. *See* David J. Barron, Acting Ass't Att'y Gen., OLC, *Best Practices for OLC Legal Advice and Written Opinions*, at 2 (July 16, 2010), *available at* http://bit.ly/1r7LHf3 ("OLC opinions should consider and ordinarily give great weight to any relevant past opinions of [OLC]," and OLC "should not lightly depart from such past decisions, particularly where they directly address and decide a point in question . . . .").

#61782v1

Judiciary Committee that they consider the Olson Memorandum a "seminal OLC opinion" and that it "govern[s] the conduct of collection activities under Executive Order 12333." (*Id.*)

To be sure, the D.C. Circuit has held that an OLC opinion prepared to provide legal advice to the FBI could not, without more, constitute the working law of the FBI. *See Elec. Frontier Found. v. Dep't of Justice* ("*EFF*"), 739 F.3d 1, 9-10 (D.C. Cir. 2014) (holding that OLC opinion was not working law of the FBI "[o]n this record"). This case, however, presents the additional indicia of working law lacking in *EFF*.

Indeed, in another case where those additional indicia were present, a court in the Northern District of California recently held that an OLC memorandum had become the working law of DOJ. At issue in that case was a memorandum on the legality of disclosing census information to federal investigators that OLC had prepared in response to a request for legal advice from the Department of Commerce. *Elec. Frontier Found. v. Dep't of Justice*, No. 11-cv-5221, 2014 U.S. Dist. LEXIS 110785, at *21 (N.D. Cal. Aug. 11, 2014). DOJ's subsequent citation to the memorandum before the Foreign Intelligence Surveillance Court and—as with the Olson Memorandum—a congressional oversight committee, the Senate Select Committee on Intelligence, in order to support DOJ's position on the legality of disclosing census information. *Id.* at *23-25 & n.2.

DOJ's contention that the Olson Memorandum does not constitute DOJ's working law relies principally on a recent decision from a court in the Southern District of New York, which held that the Olson Memorandum does not constitute working law. (Mem. of Points & Auth. in Supp. of Def.'s Mot. for Summary Judgment at 9-10, ECF No. 13 (citing *ACLU*, 2017 WL 1155910, at *10-11).)  But in that case, the court reached its conclusion by conflating two distinct doctrines—the express adoption exception and the working law exception to Exemption

20

5. The court held that the Wainstein Memorandum's reliance on the Olson Memorandum failed to show that the latter had been "'adopted, formally or informally, as the agency position on an issue.'" *ACLU*, 2017 WL 1155910, at *11 (quoting *Brennan Ctr.*, 697 F.3d at 195). But the text the *ACLU* court quoted from the Second Circuit's decision in *Brennan Center*, 697 F.3d at 195, articulates the standard for the express adoption exception, not the working law exception. Indeed, *Brennan Center* explicitly distinguished between the inquiry underlying the express adoption exception to Exemption 5—where a document has been "adopted, formally or informally, as the agency position on an issue or [is] used by the agency in its dealings with the public"—and the inquiry underlying the working law exception, which applies to documents that "embod[y] the agency's effective law and policy." *Id.* at 195 (internal quotation marks omitted); *see also id.* at 200-02; *N.Y. Times v. Dep't of Justice*, 12-cv-3215(JSR), 2013 U.S. Dist. LEXIS 7396, at *12-13 (S.D.N.Y. Jan. 7, 2013). The express adoption exception comes into play where an agency has decided to rely on an otherwise privileged documents publicly to justify its policy decisions. *See Brennan Ctr.*, 697 F.3d at 205. Unlike the working law exception, it does not turn on an agency's internal use of a document but only the extent to which it relies on it publicly. In other words, the *ACLU* court held, in substance, that the Olson Memorandum does not satisfy the test for the express adoption exception and did not determine whether it fell within the working law exception.  In any event, this Court is not bound by a decision of a court in the Southern District of New York.

Accordingly, the Olson Memorandum—and by extension, the Cover Letter summarizing it—constitutes the working law of DOJ with respect to the constitutionality of electronic surveillance under EO 12333.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully asks this Court: (i) to deny DOJ's

motion for summary judgment and to grant Plaintiffs' cross-motion for partial summary

judgment; (ii) to order DOJ to make public within 20 days, pursuant to 5 U.S.C. § 552, the

portions of the Olson Memorandum and the Cover Letter that it contends are shielded solely by

the attorney-client privilege under Exemption 5; (iii) to award the Plaintiffs the costs of this

proceeding, including reasonable attorney's fees, as expressly permitted by FOIA, *id.* §

552(a)(4)(E); and (iv) to grant such other and further relief as the Court deems just and proper.


Dated: New York, NY
           June 12, 2017

                                                  Respectfully submitted,

                                                    By:   /s/ David E. McCraw

                                                    David E. McCraw, Esq.
                                                    The New York Times Company
                                                    Legal Department
                                                    620 Eighth Avenue, 18th Floor
                                                    New York, NY 10018
                                                    phone: (212) 556-4031
                                                    fax: (212) 556-4634
                                                    e-mail: mccraw@nytimes.com
                                                    *Counsel for Plaintiffs*

22